**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JAMES RANDALL MILLER, | ) | |
| | ) | |
| Debtor, | ) | Case No. 11-CV-130-GKF-FHM |
| | ) | (lead case) |
| LEGACY REAL ESTATE INVESTMENTS, | ) | Case No. 11-CV-460-GKF-FHM |
| LLC, et al., | ) | (consolidated) |
| | ) | Case No. 11-CV-461-GKF-FHM |
| Appellant/Cross-Appellees, | ) | (consolidated) |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES RANDALL MILLER, | ) | |
| | ) | |
| Appellee/Cross-Appellant. | ) | |

## OPINION AND ORDER

Before the court is the Report and Recommendation of United States Magistrate Judge Frank H. McCarthy on the appeal from the United States Bankruptcy Court for the Northern District of Oklahoma.  [Dkt. #32].  Appellee/Cross-Appellant James Randall Miller ("Miller") has filed an objection [Dkt. #33] to the Report and Recommendation.  Likewise, petitioning creditors Legacy Real Estate Investments, LLC ("Legacy"), Summit Bank ("Summit") and Louis W. Bullock and Patricia W. Bullock d/b/a Bullock & Bullock ("Bullock"), collectively referred to as "Petitioning Creditors") have filed a partial objection to the Report and Recommendation [Dkt. #34].

# I. Background/Procedural Status

The Bankruptcy Court has issued decisions that are the subject of three appeals: *Legacy Real Estate Investments, L.L.C. et al. v. James Randall Miller,* Case No. 11-CV-130-GKF-FHM; *James Randall Miller v. Legacy Real Estate Investments, LLC,* Case No. 11-CV-460-GKF-FHM; and *Legacy Real Estate Investments, L.L.C., et al. v. James Randall Miller,* 11-CV-461-GKF-FHM.[1] The involuntary bankruptcy petition filed against the debtor by four of his creditors was dismissed based on the Bankruptcy Court's finding that three of the four creditors did not qualify to be petitioning creditors under 11 U.S.C. § 303(b)(1). Further, the Bankruptcy Court awarded the debtor $259,773.27 in attorney fees and expenses against the Petitioning Creditors, jointly and severally. The Bankruptcy Court found the petition was not filed in good faith, but denied debtor's request for compensatory damages because he failed to prove causation or the amount of damages. The Bankruptcy Court also declined to award punitive damages, concluding the attorney fee award sufficiently served the deterrent purpose of punitive damages.

The Petitioning Creditors sought reversal of:

1. the Bankruptcy Court's conclusion that the claims of Legacy Real Estate Investments, LLC and Summit Bank were the subject of a bona fide dispute as of the date of the filing of the involuntary petition;

2. the dismissal of the involuntary case and remand of the case to the Bankruptcy Court for further proceedings; or, at a minimum,

3. the Bankruptcy Court's joint and several award of attorneys' fees and expenses in favor of Miller and against Bullock; and

---

[1] The first appeal was filed on March 1, 2011, following the Bankruptcy Court's order dismissing the involuntary bankruptcy petition. The second and third appeals were filed on July 22, 2011, following the Bankruptcy Court's order awarding $259,773.27 in attorney fees against the Petitioning Creditors and denying Miller's request for damages. On August 4, 2011, the appeals were consolidated under the first-filed appeal, Case No. 11-CV-130. The records on the appeals are located in Case No. 11-CV-130 at Dkt. #5 ("Dkt. #5"), in Case No. 11-CV-460 at Dkt. #3 ("Dkt. #3"), and in Case No. 11-CV-141 at Dkt. #6 ("Dkt. #6").

4.   the Bankruptcy Court's conclusion that the involuntary petition was filed in bad faith. [Dkt. #25 at 64].

Miller appealed the Bankruptcy Court's denial of his claims for actual and punitive damages.  He seeks an award of actual damages "of at least $675,000.00" and reversal and remand of the punitive damages decision [Dkt. #24 at 10].

In his Report and Recommendation, Magistrate Judge McCarthy recommended that the Bankruptcy Court's decision be affirmed, except for the Bankruptcy Court's finding that the involuntary petition was not filed in good faith.

The Petitioning Creditors object to the Magistrate Judge's recommendation to affirm the Bankruptcy Court's finding that the claims of Legacy and Summit were the subject of a bona fide dispute.  Further, they object to the recommendation to affirm the Bankruptcy Court's ruling holding Bullock jointly and severally liable for Miller's attorney fees and expenses.

Miller objects to the Magistrate Judge's recommendation to reverse the Bankruptcy Court's finding that the involuntary petition was filed in bad faith.  He also objects to the recommendation to affirm the Bankruptcy Court's denial of his claim for actual and punitive damages.

## II. Standard of Review

Pursuant to Fed.R.Civ.P. 72(b)(3), the court is required to determine *de novo* any part of the Magistrate Judge's disposition that has been properly objected to.  *See also* 28 U.S.C. § 636(b)(1).

On appeal of a bankruptcy decision, the district court is bound to accept the bankruptcy court's findings of fact unless they are clearly erroneous, but may examine its conclusions of law *de novo.  Bartmann v. Maverick Tube*, 853 F.2d 1540, 1543 (10th Cir. 1998).  A factual finding

is clearly erroneous when the reviewing court, considering all of the evidence, is left with the definite and firm conviction that a mistake has been committed. *Id.* (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 673 (1985)). Under the abuse of discretion standard, an appellate court will not disturb a trial court's decision absent "a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Thomas v. International Business Machines,* 48 F.3d 478, 482 (10th Cir. 1995) (quoting *United States v. Ortiz,* 804 F.2d 1161, 1164 n. 2 (10th Cir. 1986).

### III. Analysis

### A. Petitioning Creditors' Objections

### 1. Whether the Claims of Legacy and/or Summit Qualified Were the Subjects of Bona Fide Disputes

In order to file an involuntary petition in bankruptcy, a creditor must be "a holder of a claim against [the alleged debtor] that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount." 11 U.S.C. § 303(b)(1). The Petitioning Creditors appeal the Bankruptcy Court's determination that the claims of Legacy and Summit were subject to a bona fide dispute.

The seminal case in this circuit regarding the meaning of the term "bona fide dispute" is *Bartmann.* There, the court explained:

> The term "bona fide dispute" is not defined in the Code and has been the subject of much debate. We choose to adopt the standard propounded by the Seventh Circuit as to what constitutes a bona fide dispute: the bankruptcy court must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt. The court need not determine the probable outcome of the dispute, but merely whether one exists. Once the petitioning creditor establishes a prima facie case that its claim is not subject to a bona fide dispute, the burden shifts to the debtor to present evidence of a bona fide dispute. Under this objective approach, the debtor's subjective intent does not control whether a claim is considered to be subject to a bona fide dispute.

4

*Id.* at 1543-44 (quotations and citations omitted). The Bankruptcy Appellate Panel of the Tenth

Circuit has held that "[t]he mere existence of pending litigation is insufficient to establish the

existence of a bona fide dispute," but "the pendency of litigation suggests that a bona fide

dispute exists." *In re Red Rock Rig 101, Ltd.,* 397 B.R. 545, 2008 WL 2052732, *1 (10th Cir.

BAP (Okla.)) (unpublished opinion) (citations omitted).

The Bankruptcy Court found that Bullock met the requirement of having an undisputed

claim, but that the remaining petitioning creditors—Legacy, Summit and Harley—did not. [Dkt.

#5-3 at 626-668]. Harley did not appeal this finding. Since there must be at least three

qualifying creditors, the Bankruptcy Court's dismissal of the involuntary petition must be

affirmed if the claims of *either* Legacy or Summit are the subject of a bona fide dispute as to

liability or amount. *See* 11 U.S.C. § 303(b)(1).[2]

### a. Legacy

The Bankruptcy Court found there was a bona fide dispute about Legacy's claim against

Miller based on a release of liability in a Foreclosure Agreement between the two parties.

Legacy loaned money to Mill Creek Lodge Estates, LLC, Mill Creek Water Sales and

Distribution, LLC, and Mill Creek Management Co., LLC (collectively, "Mill Creek"), which

were secured by real estate in Colorado and Tulsa, Oklahoma. [Dkt. #5-1 at 50]. Miller, the

manager and principal of the Mill Creek entities, personally guaranteed the loans. [*Id.*]. The

loans fell into default in 2007. On June 19, 2009, the parties entered into a Foreclosure

Agreement in which Miller and Mill Creek acknowledged a debt to Legacy of $2,882,574,31 and

confessed judgment in the amount of the debt. [Dkt. #5-1 at 50-57]. Mill Creek and Miller also

---

[2] The statute requires that an involuntary case be commenced by "three or more entities, each of which is…a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount…" 11U.S.C. § 303(b)(1).

consented to foreclosure of the Legacy liens on the Colorado property and agreed they would not contest or interfere with the foreclosure proceedings. [*Id.*]. In exchange, as long as Miller was not in default of his promises, Legacy would release Mill Creek and Miller of their liability as borrower and guarantor, respectively. [*Id.*].

Legacy filed a foreclosure action against Mill Creek, Miller and other interest holders in San Juan County, Colorado, District Court on July 20, 2009. In its Complaint, Legacy asserted claims for foreclosure of deeds of trust on the Colorado real property, water rights to the property and personal property held by defendants (including Miller) in San Juan County. [Dkt. #5-2 at 148-158]. Legacy also sought reformation of the deeds of trust on the Colorado properties and a money judgment for breach of promissory notes against Mill Creek. [*Id.*]. Legacy did *not* seek a money judgment against Miller. [*Id.*].[3]

Mill Creek and Miller contested the action. The Colorado court granted Legacy summary judgment on October 29, 2009 [Dkt. #5-2 at 268-270], and entered Judgment of Foreclosure En Masse on November 24, 2009. [Dkt. #5-2 at 271-287]. In its summary judgment order, the court found there was no genuine issue for trial regarding the Mill Creek defendants' default under the loan agreements and their admission to indebtedness in the amount of $2,882,574.31 under the Foreclosure Agreement. [Dkt. #5-2 at 269].[4] Further, it found there was no genuine dispute of material fact that defendants agreed to a non-contested foreclosure pursuant to the Foreclosure

---

[3] The Bankruptcy Court, in its Findings of Fact, stated that Legacy sought money judgment against MCLE, MCWSD *and Miller* in the amount of $2,882,574.31. [Dkt. #5-3 at 631]. A review of the Complaint in the Colorado Foreclosure confirms this statement was incorrect with respect to Miller.

[4] Additionally the Judgment and Decree of Foreclosure En Masse granted "judgment in rem with respect to the real property … in favor of Plaintiff [Legacy] and against Defendants [MCLE and MCWSD] in the amount of $2,882,574.31." [Dkt. #5-2 at 313]. The Judgment did not impose a money judgment against Miller. [Dkt. #5-2 at 310].

Agreement and that Legacy was entitled to foreclose on the real and personal property and water rights of defendants as secured by the loan agreements. [*Id.*]. The Colorado court also found Miller's claims of duress and inappropriate financial pressure to enter into the Foreclosure Agreement were not genuine issues of material facts. [*Id.*].

The Colorado court found that Legacy was entitled to its attorney's fees and costs of collection and foreclosure, "except as to the parties to the 'Foreclosure Agreement,' because attorneys fees and costs were waived as to them." [*Id.*].

Legacy moved for an amendment and clarification of the Colorado court's findings regarding attorney fees. [Dkt. #5-3 at 78-84]. It argued that the loan documents gave it the right to collect attorney fees in the event of default; the Foreclosure Agreement did not provide that the amount of indebtedness confessed included attorney fees and costs; and the Foreclosure Agreement provided that in an action to enforce the Foreclosure Agreement, the prevailing party was to be awarded its costs and expenses, including reasonable attorney fees. [*Id.* at 81]. Legacy stated that it "necessarily filed its Motion for Summary Judgment seeking to enforce the Foreclosure Agreement due to Defendants' noncompliance thereunder" and "[a]s a result, Plaintiff is entitled to collect its attorneys' fees and costs." [*Id.* at 81-82]. Legacy contended it was also entitled to recover attorneys' fees under the loan documents. [*Id.*].

The Colorado court denied Legacy's motion for fees. [Dkt. #5-3 at 85-86]. The court acknowledged Legacy was the prevailing party in the action and the loan agreements contained provisions which entitled them to attorneys' fees and costs incurred for collection under the defaulted loans, but that the provisions of the Foreclosure Agreement—specifically, Paragraphs 4, 10(d) and 13(b)—precluded recovery of attorneys' fees. [*Id.*].

Paragraph 4 of the Foreclosure Agreement, "Confession of Judgment," provided that the borrower was to confess judgment in the total indebtedness amount ($2,882,574.32) and take actions to support the lender's position in legal proceedings, not to present any defense or objections to the legal proceedings, and to sign all consents or other documents requested by the lender's counsel in connection with the legal proceedings. [Dkt. #5-1 at 51]. The paragraph concluded:

> So long as Borrower and Guarantor are not in default hereunder, Lender agrees not to seek any deficiency judgment against either Borrower or Guarantor.

[*Id.*]. Paragraph 10 ("Miscellaneous") subsection (d) provided in pertinent part:

> If any action, suit or other proceeding is brought to enforce, or for the breach of, this Agreement, the prevailing party shall be awarded its costs and expenses (including reasonable attorneys' fees and costs).

[*Id.* at 54, ¶10(d)]. Paragraph 13 ("Mutual Releases"), subsection (b) provided:

> …so long as Borrower and Guarantor shall have performed all of their obligations hereunder, Lender…shall be deemed to have fully and completely released Borrower and Guarantor from any and all liabilities, damages, causes of action and all claims of any nature whatsoever that Lender has against either Borrower or Guarantor arising out of any transaction occurring prior to the execution hereof.

[*Id.* at 55, ¶13(b)].

In its ruling denying Legacy's Motion for Amendment, the Colorado court held Legacy was not entitled to recover attorneys' fees and costs under the Foreclosure Agreement because "Legacy did not allege or prove a breach of contract of the 'Foreclosure Agreement' by Defendants Miller as to any of the preconditions under the agreement that would entitled Legacy to a judgment for costs and attorney fees against "defendants Miller." [Dkt. #5-3 at 86].

The Bankruptcy Court found that Legacy's viability as a creditor hinged on the Foreclosure Agreement. [Dkt. #5-3 at 653]. Legacy argued that whether the release of Miller contained in the Foreclosure Agreement was enforceable was not at issue in the Legacy

foreclosure, because Legacy did not plead breach of the Foreclosure Agreement and did not seek

to enforce it.  [*Id.*].   However, the Bankruptcy Court concluded otherwise, noting that Legacy's

counsel had told the Colorado court the Foreclosure Agreement was "the most critical element"

to resolution of the Legacy Foreclosure.  The Bankruptcy Court observed that the Colorado

court, both in its summary judgment ruling and in its order denying Legacy's motion to

reconsider, rejected Legacy's claim for attorney fees based on the release contained in the

Foreclosure Agreement.  [*Id.*].

The Bankruptcy Court assumed for purposes of its decision that after application of the

proceeds of the sale of its collateral, Legacy had a remaining balance due in excess of $1.6

million.  The Bankruptcy Court also commented:

> There can be no doubt that the Foreclosure Agreement contains a release of Miller.
> There is also little question that Miller's release was conditional.  Put simply, in
> order to reap the benefits of the Foreclosure Agreement (including the release of
> liability), Miller was required to cooperate with Legacy in the Legacy Foreclosure.
> The record before the Court suggests that he did not.

[Dkt. #5-3 at 653].  It stated, "The question is whether there exists a bona fide dispute regarding

Miller's liability for any such amount."  [*Id.* at 654-655].  The court concluded "[t]he finding of

the Colorado District Court that the release of Miller precluded an award of attorney's fees

against Miller in the Colorado Foreclosure creates a bona fide dispute regarding *any* liability

Miller may owe to Legacy," thus defeating Legacy's status as a petitioning creditor in the

bankruptcy case.  [*Id.* at 654] (emphasis added).

Legacy argued—and the Bankruptcy Court agreed—that it was not required to seek a

judgment against Miller—the guarantor—as part of its foreclosure action in Colorado.  [Dkt. #5-

3 at 654] (citing *U.S. v. Newton Livestock Auction Market, Inc.,* 336 F.2d 673, 677 (10th Cir.

1964) and *Joe Heaston Tractor & Implement Co. v. Sec. Accept. Corp.,* 243 F.2d 196, 199 (10th

Cir. 1957).  However, the Bankruptcy Court ruled that, as a result of the Colorado court's decision, "an issue regarding the effectiveness of the release of Miller is present, and [] the issue creates a bona fide dispute regarding the validity of the Legacy claim against Miller."  [*Id.*].

Legacy contends its claim against Miller could only be challenged on the basis that the Colorado court's denial of its attorney fee request precluded it from asserting Miller was liable on the guaranty.  It asserts, though, that "[t]he doctrine of issue preclusion always requires that the issue in question have actually been litigated and decided in a prior proceeding, and here, that indisputably did not happen." [Dkt. #34 at 9].[5]  In the Legacy Foreclosure, it did not assert a claim against Miller on his guaranty agreement; therefore, Legacy contends it is not now precluded from asserting such a claim.[6]  Further, it argues there is no genuine dispute that Miller breached the Foreclosure Agreement.  Thus, it concludes, the Colorado court's denial of its request for attorney fees did not create a bona fide dispute regarding Miller's liability.

The court concurs.  The explicitly-stated basis for the Colorado court's denial of Legacy's attorney fee request was that Legacy failed to plead and prove Mill Creek and Miller breached the Foreclosure Agreement.  While this decision was dispositive of the attorney fee

---

[5] Application of the doctrine of claim preclusion or res judicata requires (1) a final judgment on the merits in an earlier action; (2) identity of parties or privies in the two suits; and (3) identity of the cause of action.  *Wilkes v. Wyoming Dept. of Employment Div. of Labor Standards,* 314 F.3d 501, 504 (10th Cir. 2003).

[6] Legacy contends that the doctrine of claim preclusion does not apply in this action, because an action against a guarantor on a note is separate from the remedy of foreclosure and sale.  *See Alien, Inc. v. Futterman,* 924 P.2d 1063, 1067 (Colo. App. 1995) ("a guaranty is a separate and distinct contract from the underlying obligation being guaranteed"); *accord Bartmann,* 853 F.2d at 1545 (under Oklahoma law, "[g]uaranties are construed most strongly against the guarantor"); *see also Nat'l City Bnak v. The Plechaty Cos., et al.,* 661 N.E.2d 227, 230 (Ohio App. 1995); *Emerson v. LaSalle Nat'l Bank,* 352 N.E.2d 45, 48-50 (Ill. App. 1976) ("The action against guarantors of a note is separate from the remedy by foreclosure and sale.  [citation omitted].  The entry of a deficiency decree against a principle is not res adjudicata of the guarantor's liability.").

request, the order did not operate to create a bona fide dispute regarding Miller's liability on the underlying debt. Legacy's claim in the Bankruptcy Court was for amounts owed on Miller's personal guaranty and did not include any amount for attorney fees incurred in the Colorado Foreclosure. The Colorado court never reached the substantive issue of whether Miller breached the Foreclosure Agreement. Indeed, it refused to consider the issue because it had not been raised by Legacy in its pleadings. The court did not purport to decide the merits of Legacy's argument that Miller had breached the Foreclosure Agreement.

The court finds the Colorado court's ruling on attorney fees did not give rise to an objective basis for either a factual or legal dispute as to the validity of Miller's debt. *See Bartmann,* 853 F.2d at 1544. Therefore, the court concludes the Bankruptcy Court erred in finding Legacy's claim was subject to a bona fide dispute.

### b. Summit

The Petitioning Creditors contend the Bankruptcy Court erred in finding Summit's claim was subject to a bona fide dispute.

Miller's loan relationship with Summit began in September 2006. [Dkt. #5-3 at 635]. As of March 15, 2007, Miller and one of his companies, East Village Property Company, LLC ("EVPC") were indebted to Summit under a Renewal Note in the maximum principal amount of $850,000, with a maturity date of March 15, 2009 (the "Renewal Note"). [*Id.* at 635-36]. The Renewal Note was secured by mortgages on real estate in Oklahoma and by a deed of trust ("DOT") on a lot in Colorado (the "Colorado Lot"). [*Id.*].

In April 2007, Miller advised Summit that MCLE wanted to sell the Colorado Lot to Troy Hudspeth ("Hudspeth"). [*Id.*]. MCLE planned to finance the sale for a period of one year. Summit agreed to release the Colorado DOT in exchange for receiving collateral rights in the

MCLE loan to Hudspeth to secure payment of Miller and EVPC's obligations to Summit. [*Id.*]. The sale to Hudspeth occurred in late May and early June 2007. [*Id.*]. Hudspeth executed a promissory note in favor of MCLE (the "Hudspeth Note"), and granted a lien on the Colorado Lot to MCLE under a deed of trust (the "Hudspeth DOT"). [*Id.* at 636-37]. MCLE then assigned the Hudspeth Note and the Hudspeth DOT to Summit as collateral for the amounts owed to Summit by Miller and EVPC (the "MCLE Assignment"). [*Id.* at 637]. As part of the transaction, Miller and EVPC executed and delivered a Second Renewal Note to Summit in the amount of $770,000.00 (the "Second Renewal Note"). [*Id.*].

Within months, Hudspeth defaulted on the Hudspeth Note. On December 13, 2007, Summit executed a document entitled "Colorado Statutory Power of Attorney for Property" (the "POA"), in which Summit authorized MCLE to commence foreclosure proceedings with respect to the Hudspeth DOT on behalf of Summit. [*Id.;* Dkt. #5-3 at 96-98]. Under the POA, MCLE was obligated "[t]o use due care to act for [Summit's] benefit. [*Id.* at 96].

MCLE commenced a foreclosure action against Hudspeth in the Colorado District Court on December 28, 2007 (the "Hudspeth Foreclosure"). [Dkt. #5-3 at 637]. A judgment foreclosing the Hudspeth DOT was entered on June 12, 2009. [*Id.*]. A sale of the Colorado Lot by the Sheriff of San Juan County, Colorado (the "Sheriff") was scheduled to take place on July 30, 2009. [*Id.*].

On or about June 19, 2009, MCLE entered into a real estate contract with Bush Mountain, LLC ("Bush Mountain"), under which Bush Mountain agreed to purchase the Colorado Lot for $500,000 (the "Bush Mountain PSA"). [*Id.* at 638]. The sale was to close on July 31, 2009, one day after the scheduled Sheriff's sale. [*Id.*]. All proceeds of the Bush Mountain PSA were to be paid to Summit. [*Id.*]. Summit expected to receive a minimum of

$450,000 in proceeds from the sale. [*Id.*]. Upon condition that it receive the proceeds from the Bush Mountain PSA, Summit agreed to extend the maturity date of the Second Renewal Note until July 31, 2010. [*Id.*].

The foreclosure sale took place as scheduled on July 30, 2009. [*Id.*]. MCLE submitted a written bid to purchase the Colorado Lot at the Sheriff's sale in the amount of $889,053.73, the full amount Hudspeth owed MCLE under the Judgment.[7] [*Id.*]. MCLE was the sole bidder at the sale. [*Id.*]. MCLE prepared and sent a Sheriff's Certificate of Purchase on the Colorado Lot to the Sheriff that was acknowledged on August 13, 2009, before a notary public and returned to MCLE without recording (the "Sheriff's Certificate"). [*Id.*]. The Sheriff's Certificate reflected that MCLE was the purchaser at the sheriff's sale and would be entitled to a deed for the property at the end of the redemption period unless redemption was made. [*Id.*].

The sale of the Colorado Lot under the terms of the Bush Mountain PSA fell through on August 6, 2009, ostensibly because of the failure of MCLE to deliver an acceptable title insurance commitment. [*Id.* at 638-39]. After the sale fell through, Miller continued to communicate with Mark Poole, the President and Chief Lending Officer of Summit ("Poole"), regarding loan extension and repayment options. [*Id.* at 639]. As part of the negotiations, Summit

---

[7] The Bankruptcy Court found that "Summit was aware of the amount of the bid and did not object." [Dkt. #5-3 at 638]. Summit contends there is no support in the record that it was aware of the bid amount before MCLE sent it to the Sheriff. [Dkt. #25 at 25]. Poole testified that prior to the sale, Summit believed MCLE would submit a bid of $500,000, and Summit did not authorize a full credit bid. [Dkt. #5-3 at 445 (Tr., 238:13-25), 451 (Tr., 244:15-21), and 459 (Tr. 251:20-24)]. Miller argues, however, the Summit later ratified the full credit bid by its conduct after the sale.

requested that Miller provide Summit with additional real estate collateral.  [*Id.*]. This did not

happen. [*Id.*].[8]

On August 24, 2009, the Sheriff's Sale was confirmed.  [Dkt. #5-3 at 117].

On September 1, 2009, Summit filed a "Motion to Clarify Journal Entry of Judgment,

Certificate of Purchase, Report and Return of Sale, and Order Approving Sheriff's Sale" (the

"Motion to Clarify"), seeking:

1. A determination that Summit was the holder of the Hudspeth Note and the Hudspeth DOT;

2. A finding that, with respect to the Hudspeth Foreclosure, MCLE acted solely as Summit's agent;

3. A finding that Summit is the actual holder of the Sheriff's Certificate;

4. An order directing the Sheriff to execute, deliver, and record a deed to the Colorado Lot listing Summit as the grantee; and

5. Such other and further relief as may be just and proper.

[*Id.* at 639].  Summit did not object to the amount bid by MCLE for the Colorado Lot in the

Motion to Clarify. [*Id.*].

---

[8] Poole testified he was concerned that the Hudspeth foreclosure had wiped out Summit's lien interest and that Mill Creek would potentially get the lot back in ownership without Summit having a collateral interest in the lot.  During an August 14, 2009, meeting with Miller, Poole presented Miller with a deed of trust intended to restore Summit's collateral position. [Dkt. #5-3 at 404-405 (Tr. 197:16-198:16)]. Poole testified Miller took the deed of trust with him to have his attorney review, but did not indicate to Poole that he believed the bid Mill Creek had submitted at the sheriff's sale completely wiped out his debt to Summit Bank.  [*Id.* at 406 (Tr. 199:1-11].  On August 24, 2009, Miller sent Poole an email about a Mayes County farm Summit and Miller talked about being used as collateral for an extension on the loan.  [*Id.* at 408-409 (Tr. 201:24-202:21)].  In the email, Miller was taking the position he did not need a loan to pay accrued interest on the Summit loan.  [*Id.* at 409 (Tr. 202:12-20)].  Summit argues Miller's continued acknowledgment of his personal obligations to Summit after the Sheriff's Sale belies his claim that the Sheriff's Sale extinguished his personal debt to Summit and precludes any notion of an agreement that he would be released from the obligation to Summit.

Also on or about September 1, 2009, Miller prepared and executed a document entitled "Assignment of Sheriff's Certificate of Purchase Issued in Sale No. 08-CV-01" (the "First Assignment"). Under the terms of the First Assignment, MCLE purported to assign all of its interest in the Sheriff's Certificate to Summit. Additionally, the First Assignment stated:

> This Assignment is made for the purpose of extinguishing any and all collateral interest in or against the Property in exchange for the full and final release by Assignee [Summit] of the certain Promissory Note dated March 15, 2007 by and between Assignee and Mill Creek Lodge Estates, LLC together with the release of any and all other liens and indebtedness to which the Property is or may be subject.

Poole objected to the release language in the First Assignment and demanded that it be removed. [*Id.* at 640]. Miller then prepared and executed another "Assignment of Sheriff's Certificate of Purchase Issued in Sale No. 08-CV-01" (the "Second Assignment"), dated September 4, 2009. [*Id.*]. The Second Assignment contained the following language:

> This Assignment is made for the purpose of extinguishing any and all collateral interest and security interest in or against the Property in exchange for the full and final release by Assignee [Summit] of the following all filed of record with the San Juan County Clerk and Recorder: that certain Promissory Note dated March 15, 2007 by and between Assignee and East Village Property Company, LLC/J. Randall Miller; that certain Modification of Mortgage dated March 15, 2007 by and between Assignee and East Village Property Company, LLC; that certain Guaranty Dated March 15, 2007 by and between Assignee and Mill Creek Lodge Estates, LLC; Deed of Trust dated June 1, 2007 and Recorded June 5, 2007 at Reception Number 145733; Assignment of Deed of Trust and Promissory Note dated May 25, 2007, Recorded June 5, 2007 at Reception Number 145735; Power of Attorney dated December 13, 2007, Recorded December 26, 2007 at Reception Number 146205; and together with the release of any and all other liens and indebtedness to which the Property is or may be subject.

[*Id.* at 640-41].

The Second Assignment was filed of record on September 4, 2009.[9] [*Id.* at 641].

---

[9] Poole testified there was never any agreement at any time with respect to a credit-bid or that the full credit-bid extinguished Miller's debt obligation to Summit Bank. [Dkt. #5-3 at 414 (TR. 207:7-12)]. He testified that Summit just wanted to be repaid on its loan, and there was no agreement to take the property to extinguish the debt. [Dkt. #5-3 at 417 (Tr. 210:4-24]

On September 9, 2009, the Sheriff executed a deed to the Colorado Lot listing Summit as the grantee (the "Summit Deed"). The Summit Deed was filed of record on September 10, 2009. [*Id.*].

On October 15, 2009, Summit made formal demand upon Miller for payment of all amounts Summit claimed due and owing. [*Id.*]. Miller refused to make any payments. [*Id.*]. On November 26, 2009, Summit sued the Millers, MCLE and other related legal entities in Tulsa County District Court (the "Summit State Court Action"). [*Id.*]. In that lawsuit, Summit asserted claims for foreclosure of Summit's mortgage liens on two Tulsa properties; a claim against Miller and MCLE for fraud and breach of fiduciary duty in connection with the Hudspeth Foreclosure, specifically with respect to the execution and filing of the Second Assignment; an equitable claim for a determination that the filing of the second Assignment did not release Miller from any liability that Miller owed to Summit and that Summit was authorized to sell the Colorado Lot without fear that its actions could be considered a full satisfaction of the debt owed by Miller and EVPC to Summit. [*Id.*]. In his answer, Miller alleged all debt owed to Summit had been paid in full as a result of the sale of the Colorado Lot. [*Id.*]. He sought dismissal with prejudice of Summit's claims and an award of attorney fees. [*Id.*]. The Summit State Court Action remained pending at the time the involuntary petition was filed. [*Id.* at 641-42].

Poole testified that, as of May 11, 2010, Miller owed Summit $888,164.85, with interest on the debt accruing at a rate of $333.33 per day. [*Id.* at 642]. As of the date the involuntary petition was filed, none of the real estate collateral claimed by Summit had been liquidated. [*Id.*]. There was no meaningful evidence in the record as to the value of these properties. [*Id.*].

The Bankruptcy Court held there was "no doubt" Summit loaned Miller or his related entities the sum of $800,000, and that Miller was either directly obligated on or personally

guaranteed the loans. [Dkt. #5-3 at 655]. Further, the court stated, "Clearly, Miller attempted to extinguish all liability to Summit by preparing and recording the Second Assignment." [*Id.*]. However, the court concluded significant questions remained regarding the effects of the Hudspeth Foreclosure and the Summit deed. [*Id.*]. These questions, the court found, precluded a finding that Summit's claim was not the subject of a bona fide dispute. [*Id.*]. Additionally, the Bankruptcy Court found Summit had not provided evidence establishing it was the holder of an unsecured claim; therefore, it had not satisfied the requirement of 11 U.S.C. § 303(b)(1) requiring claims that "aggregate at least $14,425 more than the value of any lien on property of the debtor securing such claims[.]" [*Id.* at 656].

In his Report and Recommendation, the Magistrate Judge agreed with Summit that under § 303(b)(1), even a fully secured creditor is eligible to be a petitioning creditor as long as the aggregated debts of the other unsecured creditors reach the statutory requirement. [Dkt. #32 at 12, n. 7]. Nevertheless, he opined that the issue need not be resolved, because Summit was ineligible to be a petitioning creditor on the basis of the dispute concerning Miller's liability. [*Id.*].

The Petitioning Creditors object to the Magistrate Judge's finding that Summit was ineligible to be a petitioning creditor. They contend that "[u]nder the circumstances of this case, Summit's receipt of the deed does not give rise to [a] bona fide dispute regarding Miller's loan obligation." [Dkt. #34 at 15].

Based on its review of the record, the court concludes the Bankruptcy Court did not err in finding Summit had failed to establish its claim was not the subject of a bona fide dispute. Summit cites *In re CLE Corp.,* 59 B.R. 579, 584 (Bankr. N.D. Ga. 1986) for the proposition that the assertion of creative defenses by a debtor is not sufficient to establish a bona fide dispute. In

*CLE Corp.,* however, the debtor's president testified that none of the so-called disputes were developed until after he had met with counsel subsequent to the filing of the Petition. *Id.* The court concluded, "From both the timing and substance of Debtor's alleged disputes, it is apparent that the Debtor's disputes are not in good faith and have been raised solely for the purpose of opposing the Petition." *Id.* at 584-585.

Here, the dispute over the Summit loan arose well before the bankruptcy petition was ever filed, at the time of the Hudspeth Foreclosure. While Summit has presented evidence supporting its position that Miller engaged in a series of wrongful acts aimed at extinguishing Summit's collateral interest in the Colorado Lot, the fact remains that Miller contests liability and has since the issuance of the deed to Summit following the full credit bid. The Bankruptcy Court correctly concluded that a bona fide dispute as to whether and to what extent the debt remained. It was not required, under *Bartmann,* to determine the probable outcome of the dispute. Thus, the Bankruptcy Court did not err in finding Summit did not qualify as a petitioning creditor under § 303(b)(1).

## 2. Attorney Fees

The Bankruptcy Court entered a judgment holding the petitioning creditors jointly and severally liable for attorney fees and expenses in the amount of $259,773.27 under 11 U.S.C. § 303(i). [Dkt. #6-1 at 127]. The Petitioning Creditors contend the Bankruptcy Court erred in holding Bullock jointly and severally liable for Miller's attorney fees and expenses "without any individualized consideration of the totality of the circumstances (including the merits of the Bullock Claim)." [Dkt. #25 at 46].

The decision about whether to award attorney fees "is committed to the discretion of the trial court." *In re Hentges,* 351 B.R. 758, 770 (Bankr. N.D. Okla. 2006) (citing *Susman v.*

*Schmid (in re Reid),* 854 F.2d 156, 159 (7th Cir. 1988). *See also Southern Cal. Sunbelt Dev. Inc.,* 608 F.3d 456, 464 (9th Cir. 2010); *In re Kidwell,* 158 B.R. 203, 216 (Bankr. E.D. Cal. 1993). The fact that a petitioner has a meritorious claim does not preclude an award of attorney fees under § 303(i). *Kidwell,* 158 B.R. at 216]. In *Hentges,* the court, in determining whether to award fees, noted that "most courts employ a 'totality of the circumstances' test." 351 B.R. at 770. Relevant circumstances include (1) the merits of the involuntary petition; (2) the role of any improper conduct on the part of the alleged debtor; (3) the reasonableness of the actions taken by petitioning creditors; (4) the motivation and objectives behind filing the petition; and (5) other material factors the court deems relevant. *Id.*

Section 303(i) unambiguously authorizes the trial court to exercise individualized discretion in the award of attorney fees. *See In re Maple-Whitworth,* 556 F.3d 742, 745 (9th Cir. 2009). The trial court may consider factors such as relative culpability among the petitioners, the motives or objectives of individual petitioners in joining in the involuntary petition, the reasonableness of the respective conduct of the debtors and petitioners and other individualized petitioners, the motives or objectives of individual petitioners in joining in the involuntary petition, the reasonableness of the respective conduct of the debtors and petitioners, and other individualized factors. *Id.* at 46. "[A] bankruptcy court has discretion to hold all or some petitioners jointly or severally liable for costs and fees, to apportion liability according to petitioners' relative responsibility, or to deny an award against some or all petitioners, depending on the totality of the circumstances." *Id.*

The Bankruptcy Court acknowledged in both its Opinion and Supplemental Memorandum Opinion that "[w]hen considering whether to award costs and fees, courts examine the totality of the circumstances." [Dkt. #5-3 at 661; Dkt. #6-1 at 103]. In its Memorandum

Opinion, the court discussed the basis for its decision to award fees against the petitioning creditors, stating, "All petitioning creditors, regardless of the viability of their claims against the debtor, are subject to this statute and may be held to pay fees, costs, and damages." (citing *Kidwell,* 158 B.R. at 216 (Bankr. E.D. Cal. 1993). [Dkt. #5-3 at 661]. The court stated that three of the four petitioning creditors (Legacy, Summit and Bullock) had been involved in business relationships with Miller that had foundered, and all three have been involved in "protracted negotiations and litigation with Miller." [*Id.,* at 662].

The court also discussed each individual petitioning creditors' testimony about their motivations for joining the involuntary petition. [*Id.* at 647-649]. Specifically regarding Bullock, the court noted, "Louis Bullock stated his belief that the filing of a bankruptcy petition would be the most efficient way to collect on the moneys owed to Bullock by Miller." [*Id.* at 648-649]. It also observed that Bullock was engaged in state court litigation with Miller to collect the debt owed. [*Id.* at 662].

Petitioning Creditors contend the Magistrate Judge's recommendation that the Bankruptcy Court's bad faith finding be reversed is irreconcilable with his recommendation that the attorney fee award be confirmed. This court disagrees. Although few courts have assessed fees and costs absent a finding of bad faith, it is apparent on the face of the statute that such a finding is not required. *In re Fox Island Square Partnership,* 106 B.R. 962, 967 (Bankr. N.D. Ill. 1989); *In re Advance Press & Litho, Inc.,* 46 B.R. 700, 702 (Bankr. D. Colo. 1984). As the court in *Advance Press* stated, "it is evident from the alternative provisions of § 303(i)(1) and (2) that Congress sensed there would be situations where the burdens imposed upon debtors, even in good-faith circumstances, should require the losing creditors to pay for the burden they created." 45 B.R. at 702.

Nevertheless, this court's reversal, in Section III.B.1 below, of the Bankruptcy Court's finding that the Petitioning Creditors acted in bad faith, impacts the viability of the Bankruptcy Court's award of attorney fees jointly and severally against Bullock. "The presence or absence of bad faith will inform the exercise of the district court's discretion under § 303(i)." *In re Reid,* 854 F.2d at 160. Thus, the attorney fee decision must be reversed and remanded for individualized consideration—as set out in *Hentges*—of the joint and several award against Bullock in the absence of bad faith.

## B. Miller

Miller has objected to the Magistrate Judge's recommendation to reverse the Bankruptcy Court's finding that the involuntary petition was filed in bad faith. [Dkt. #33]. Additionally, he objects to the Magistrate Judge's recommendation to affirm the Bankruptcy Court's refusal to award actual and punitive damages to Miller. [*Id.*].

### 1. Bad Faith

Section 303(i)(2) permits an award of damages against any petitioner who filed an involuntary bankruptcy petition in bad faith. The Bankruptcy Court found the Petitioning Creditors filed the involuntary bankruptcy petition in bad faith but held the debtor failed to establish actual damages or a basis for punitive damages.

The Magistrate Judge recommended reversal of the bad faith finding, concluding (1) the Bankruptcy Court failed to address the question of which party has the burden of proof on the bad faith issue; (2) the Bankruptcy Court failed to analyze the facts of this case in relation to factors identified in other courts' tests for determining whether a petition was filed in bad faith; (3) although case authority holds there is a presumption of good faith in favor of petitioners and that debtor has the burden of proving bad faith, the Bankruptcy Court appeared to place the

burden of proof on the Petitioners to prove an absence of bad faith by proving good faith; (4) the Bankruptcy Court failed to make factual findings about the reasonableness of petitioners' position that their claims were not subject to a bona fide dispute; and (5) the Bankruptcy Court erred in finding the Petitioning Creditors' desire to collect debts supported a bad faith finding.

Case authority holds—and Miller concedes—that there is a presumption of good faith in favor of petitioners and the debtor has the burden of proving bad faith. *See In re John Richards Homes,* 439 F.3d 248, 254 (6th Cir. 2006); *In re Bayshore,* 209 F.3d 100, 105 (2nd Cir. 2000); *Hentges,* 351 F.R. at 770; *In re Reveley,* 148 B.R. 398, 406 (Bankr. S.D.N.Y. 1992); *In re Apache Trading Group,* 229 B.R. 891, 892-92 (Bankr. S.D. Fla. 1999); [Dkt. #33 at 5]. The Bankruptcy Court did not specifically address the burden of proof issue. The Petitioning Creditors assert the court's comment that the creditors' claim of acting in good faith "rings hollow," [Dkt. #5-3 at 664] demonstrates it considered the creditors bore the burden of proving good faith. This court does not necessarily agree with the creditors, but concludes the Bankruptcy Court's failure to articulate the applicable burden of proof raises the question of whether it applied the correct burden of proof.

The Bankruptcy Code does not define "bad faith." The Tenth Circuit has found that in order to grant sanctions under the bad faith exception, there must be clear evidence that a party's claims were frivolous and that they were pursued in bad faith. *FDIC v. Schuchmann,* 319 F.3d 1247, 1252 (10th Cir. 2003). The court instructed:

> The mere fact that a party did not prevail in the district court does not necessarily imply that its conduct was improper. Further, bad faith requires more than a mere showing of a weak or legally inadequate case, and the exception is not invoked by findings of negligence, frivolity or improvidence. In addition to making an explicit finding of improper motive, the trial court must also inform the court upon which factual basis [it] arrived at the conclusion of bad faith.

*Id.* (quotations and citations omitted). Similarly, courts have found bad faith when the filing of the petition "was motivated by ill will, malice, or a desire to embarrass or harass the alleged debtor." *Hentges,* 351 B.R. at 772 (citing *Bayshore,* 209 F.3d at 105, *In re Camelot, Inc.,* 25 B.R. 861, 864 (Bankr. E.D. Tenn. 1982) and *General Trading Inc. v. Yale Materials Handling Corp.,* 119 F.3d 1485, 1501 (11th Cir. 1997).

[Dkt. #5-3 at 661].

Although the Tenth Circuit has not done so,[10] other courts have developed various tests to determine whether bad faith is present. *See Bayshore,* 209 F.3d at 105. Those tests include:

1. The "improper use" test, which "finds bad faith when a petitioning creditor uses involuntary bankruptcy procedures in an attempt to obtain a disproportionate advantage for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interests in a different forum." *Id.* (citations omitted);

2. The "improper purpose" test, "where bad faith exists if the filing of the petition was motivated by ill will, malice, or a desire to embarrass or harass the alleged debtor." *Id.* (citations omitted).

3. The "objective test" for bad faith "based on what a reasonable person would have believed." *Id.* (citations omitted); and

4. A bad faith inquiry modeled on the standards set forth in Bankruptcy Rule 9011, which requires analysis of both the objective reasonableness of the petitioning creditors' filing of an involuntary petition and their subjective intent.

*Id.*; *Hentges,* 351 B.R. at 775-76.

The Bankruptcy Court held that the primary reason the Petitioning Creditors filed the involuntary petition was to remove Miller as a real party-in-interest in the pre-existing litigation and replace him with a bankruptcy trustee in the hopes of concluding that litigation as quickly as

---

[10] The parties cite no case wherein the Tenth Circuit has adopted a test, nor has this court discovered one.

possible. [664-65]. The court found "[t]hese are not proper purposes for the filing of an involuntary bankruptcy case." [*Id.* at 665].

The court disagrees with this conclusion, both as a matter of law and as applied to the facts of this case. In *Hentges,* the Bankruptcy Court in this District examined at length the question of whether the collection of claims in bankruptcy court rather than an alternative forum constituted "bad faith," and found it did not. The court stated:

> While it is true that these creditors had the option of continuing to proceed in Tulsa County District Court to attempt to collect on the judgments and guarantees, that fact, in and of itself, does not support an inference of bad faith. Creditors are justified in filing an involuntary bankruptcy against a debtor where exclusive bankruptcy powers and remedies may be usefully invoked to recover transferred assets, to "insur[e] an orderly ranking of creditors' claims" and "to protect against other creditors obtaining a disproportionate share of debtor's assets." Creditors may also use the bankruptcy process to install a trustee to prevent future transfers or wasting or dissipation of assets or to investigate and to challenge the legitimacy of entities that may be operating as alter egos of a debtor.

351 B.R. at 772 (citing *In re Better Care, Ltd.,* 97 B.R. 405, 411 (Bankr. N.D. Ill. 1989). Further, the court in *Hentges* pointed out that if the involuntary petition would have been successful, a Chapter 7 trustee would have had a duty to vigorously pursue the debtor's lawsuit for the benefit of the estate if the suit had merit; thus, the court could not conclude the substitution of the Chapter 7 trustee for the debtor as the plaintiff in the lawsuit would have given the petitioning creditor "any unfair or disproportionate advantage" over the debtor's other creditors. *Id.* (quotation and citation omitted).

The court cannot conclude—applying any of the four tests outlined in *Bayshore and Hentges*—that the Petitioning Creditors acted in bad faith. Under the "improper use" test, there is no evidence the creditors attempted to obtain a disproportionate advantage over other creditors; thus, no "improper use" can be found. Applying the "improper purpose" test, the court notes that while litigation between the Petitioning Creditors and the debtor was contentious, there

is no evidence the Petitioning Creditors were motivated by ill will or malice; rather, they all were attempting to collect a debt. Under the "objective test" approach, Legacy and Bullock clearly acted reasonably in believing they had claims that were not subject to a bona fide dispute. Even Summit—given Miller's conduct with respect to the Colorado property—could be said to have reasonably believed the claim was not subject to a legitimate dispute. Finally, under the modified Bankruptcy Rule 9011 analysis, all through Petitioning Creditors acted with objective reasonableness and their subjective intent—to collect debts owed to them—was permissible.

The Bankruptcy Court cited two cases in support of its conclusion that it was improper for petitioning creditors to file an involuntary petition to displace the debtor for purposes of collection litigation: *In re Nordbrock,* 772 F.2d 397, 399 (8th Cir. 1985) ("This case reflects efforts by a single creditor to use the Bankruptcy Court as a forum for the trial and collection of an isolated disputed claim, a practice condemned by prior decisions"); and *In re SBA Factors of Miami, Inc.,* 13 B.R. 99 (Bankr. D. Fla. 1981) (finding involuntary [petition] to be filed in bad faith where it was intended by creditors "as a substitute for customary collection procedures." Both cases, however, are distinguishable from this fact situation.

*Nordbrock* did not involve the question of whether a petition had been filed in bad faith. Rather, the appellate court affirmed the trial court's dismissal of an involuntary petition filed by a single creditor because the § 303(h)(1) criteria that the debtor was generally not paying debts as they became due had not been satisfied. There, the creditor sought to recover a debt of approximately $3 million on a personal guarantee. The alleged debt was the only obligation of the debtor. 722 F.2d at 398-99. The court dismissed the petition, finding the creditor failed to establish the debtor was not generally paying his debts when they came due, as required by §

303(h)(1). *Id.* at 399. The court also found that under § 303(a), the petition had to have been filed by three or more creditors. *Id.*

In *SBA Factors,* the court found petitioners acted in bad faith in filing or joining the filing of an involuntary petition. In so ruling, the court concluded the petitioners completely failed to carry their burden under § 303(h)(1) to show the debtor was not paying his debts as they became due. The court conducted a fact intensive review of each creditor's conduct and motives. It found the original petitioning creditor, Classic Printers, Inc., alleged the debtor owed it $29,000, but had failed to invoice the debtor for any part of the sum. The creditors who had joined as petitioning creditors—Venture Group, Inc., and Philip Dennis, claimed there was a default by a third party on an account receivable sold by the debtor to Venture Group. However, they presented no evidence the debtor had guaranteed any debt owed Venture Group, and under Florida's statute of frauds, the obligation was required to be in writing or alternatively, partial performance must have occurred. The debtor had produced all invoices it had received for six months before the petition was filed, together with cancelled checks reflecting payment of each invoice. *Id.* at 100.

In contrast to *Nordbrock,* this was not a single creditor case. Four creditors—each with claims they believed were not subject to a bona fide dispute—joined in filing the involuntary bankruptcy petition. And while the Bankruptcy Court in this case found three of the four claims *were* subject to a bona fide dispute, the claims—in contrast to those asserted in *SBA Factors*—could not be characterized as frivolous.

The court agrees with the Magistrate Judge's opinion that the desire to collect a debt is not—in itself—sufficient to support a finding of bad faith, because a desire to collect a debt underlies all creditors' participation in an involuntary bankruptcy.

Here, the Bankruptcy Court observed that Legacy, Summit and Bullock had been involved in protracted litigation with Miller and "[a] reasonable person could easily conclude that the state court litigation between these parties will continue unabated for years." [Dkt. #5-3 at 662]. However, the court failed to make specific factual findings about the reasonableness of each of the Petitioning Creditors' position that their claims were not subject to a bona fide dispute. Further, the court did not discuss whether each creditor had a reasonable belief that Miller was not paying his debts as they came due, or the extent to which each party relied on advice of counsel in filing the petition.

The court concurs with the Magistrate Judge's conclusion that the Bankruptcy Court did not adequately support its finding of bad faith by engaging in a fact intensive discussion of the creditors' motivation and state of mind at the time the involuntary bankruptcy petition was filed. Lacking "clear evidence" that Petitioning Creditors' claims "were frivolous and that they were pursued in bad faith," as set forth in *Schuchmann,* this court finds the bad faith decision must be reversed. 319 F.3d at 1252.

### 2. Denial of Damages to Miller

Miller sought $812,791.29 in compensatory damages and punitive damages between $1.6 million and $4 million. [Dkt. #6-1 at 102]. The Bankruptcy Court declined to award actual damages to Miller, finding he failed to prove damages with a degree of certainty and further failed to prove the alleged damages were proximately caused by the filing of the involuntary petition. [Dkt. #6-1 at 123]. The Bankruptcy Court also declined to award punitive damages, finding the award of attorney fees served as an adequate deterrent to misuse of the involuntary bankruptcy process in the future. [*Id.* at 126].

Miller appealed the Bankruptcy Court's finding that his claims for lost future profits were unsubstantiated and the denial of his claim for punitive damages.

The burden is on the party seeking damages to provide evidence of the amount of damages. *Jennings v. Rivers,* 394 F.3d 850, 853 (10th Cir. 2005). Miller claimed damages for future loss of income totaling $675,000 ($135,000 per year) over a five-year period. The sole support for this claim was Paragraph 24 of Miller's Affidavit, in which Miller estimated his future lost profits. [Dkt. #6-1 at 31]. The Bankruptcy Court concluded "an award of actual damages for lost profits would be an exercise in pure speculation, as would a finding that any such damages were caused by the filing of the involuntary petition. [Dkt. #6-1 at 121]. The court concurs with the Bankruptcy Court's conclusion that Miller failed to prove the damages with a degree of certainty and failed to prove the damages were proximately caused by the filing.

The Bankruptcy Court declined to award punitive damages, finding the assessment of attorney fees against the Crediting Petitioner was an adequate deterrent. [Dkt. #6-1 at 125-26]. An award of punitive damages is a matter left to the discretion of the bankruptcy court. *In re K.P. Enter.,* 46 B.R. 700, 701 (Bankr. D. Colo. 1984); *In re K.P. Enter.,* 135 B.R. 174, 183 (Bankr. D. Me. 1992). The court finds the Bankruptcy Court did not abuse its discretion in denying Miller's request for punitive damages.

### IV. Conclusion

The Report and Recommendation of Magistrate Judge McCarthy [Dkt. #32] is accepted in part and rejected in part. The Bankruptcy Court's finding that Legacy Real Estate Investments, LLC's claim against the debtor was subject to a bona fide dispute is reversed. Additionally, the Bankruptcy Court's finding that the Petitioning Creditors acted in bad faith in filing their involuntary bankruptcy petition is reversed. Further, the Bankruptcy Court's joint

and several award of attorney fees against Louis Bullock is reversed and remanded to the Bankruptcy Court for further consideration consistent with this order.  In all other respects, the decision of the Bankruptcy Court is affirmed.

ENTERED this 26th day of March, 2012.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT